All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good afternoon. First case is 06-1254 AstraZeneca v. KV Pharmaceutical. Mr. Beckel. Thank you, Your Honor. May it please the Court. With the Court's permission, I'd like to address first the inequitable conduct issues in the case. The judge below decided the facts of materiality and intent on summary judgment without hearing any witness testimony. And the standard of review here, therefore, is whether the judge resolved any genuinely disputed issue of fact and whether he failed to give Astra the benefit of every reasonable inference. And with respect, we think the decision below fails in both those regards. The first thing I would like to bring the Court's attention to is what we have in the blow-up here. I apologize. That one is probably illegible from the bench. It is. It certainly is. But you can find it in the appendix at A-74-17. This is a letter from Mr. Nesman, who at that time was the internal patent agent for Astra and now is a patent Court of Appeals judge in Sweden, to his outside counsel, Mr. Filari, at that time somebody with about 20 years of experience. The letter is key because the judge below found only that Mr. Nesman committed inequitable conduct. He was the only person found to have committed inequitable conduct. Is there any significance to the fact that he provided a letter rather than the documentation that he was relying on to write the letter to ask for the opinion? No, there isn't, Your Honor. And that's exactly why we put this up as the exhibit to look at. Because in fairness, when you read the letter, you will find that all of the information that was relevant to the issue that Mr. Filari was being asked was presented to him in the letter and in the notebook page that was attached to the letter. And plus, there was a telephone conversation the next day that involved Mr. Nittenberg's boss, Mr. Bernstein, and the head of the patent department, and Mr. Nesman, and Mr. Filari, and which Mr. Filari could get all of his questions answered. The judge found that Mr. Nesman was guilty of inequitable conduct for two reasons. First, he said that Mr. Nesman had intentionally withheld from Filari facts about the dispute that had existed between Laius and Astra about whether Mr. Nittenberg was the sole inventor of the compound metoprolol succinate. And he found the intent based on a motivation. He said the motivation for doing that was the fear that if Mr. Nittenberg was made the sole inventor of the then-pending application, they would have lost priority benefit to a parent application that had been filed in the names of Appleton and Neskelson. The gist of the letter is that Mr. Nesman is raising with Mr. Filari the issue of Mr. Nittenberg's status as an inventor. And there alone, I think, you have the antithesis of any attempt at concealment. If Mr. Nesman were worried about disclosing Mr. Nittenberg's role in the case, he could have just kept quiet. But that only goes to the 154 patent, not to the 161. Is that correct? It goes to both, Your Honor. The 154 patent is the one that claims metoprolol succinate as compound. The 161 patent claims pharmaceutical composition. But Filari's opinion only went to the 154. At the time Filari gave the opinion, the CIP application that was on file had both claims in it, both the compound claim and the pharmaceutical composition claim. So does the opinion letter go to both applications or just one? Both of those inventions were claimed in the CIP application that was on file at the time. So the opinion was directed to both. To both, 154 and 161. Yes. Now, you're not appealing the validity of 161, are you? No, we're not. So that one is off the table. That's correct, Your Honor. And the only one that's before us is 154. That's correct. We are appealing for the finding of inequitable conduct with regard to 161, but we're not appealing the validity of the definition. Now, if you look at the letter itself, and again, I apologize, you can't read it up there. But the first thing is, as I said, Mr. Nesman raises with Filari the question of inventorship. And he says, first he says that the compound metoprolol succinate was first synthesized in 1971 by Mr. Nittenberg. And he gives him a copy of the notebook entry of Mr. Nittenberg, which is in fact the only evidence that existed at the time for Mr. Nittenberg's contribution. He then goes on to say that they discovered that a patent application had been filed with Leyes, by Leyes, in the Swedish Patent Office. And he tells him explicitly that Astra took action in the Swedish Patent Office. And he says, asserting rights under the patent based on Hessler's view that the invention of metoprolol succinate was made by Mr. Nittenberg. So clearly saying that Mr. Nittenberg was the inventor of the invention, metoprolol succinate, the thing that the judge said he would help with. And that Appelgren and Eskilsson had used secret Hessler know-how in making reference to metoprolol succinate. And he goes on to say there's an open question about inventorship that he wants Mr. Filari to advise on. And he says that they have proposed to Leyes to add Mr. Nittenberg to the Swedish application, but so far Leyes has not agreed to do that. So I think if you compare that to the various items that the judge said were withheld from Mr. Filari, you'll see that the substance of those communications was completely disclosed to Filari in the letter. There's no suggestion there other than that Nittenberg was asserted to be the sole inventor of the compound metoprolol succinate. If I can ask you a question on this Nettlesome little double patenting issue. Yes, sir. Relating, I guess, to the 154 patent. In general foods, there's the statement, the rule is laid out at 972 Fed Second 1278. Does any claim in the application define merely an obvious variation of an invention claimed in the patent asserted as supporting double patenting? If the answer to that question is no, there is no double patenting. Well, I gather that the other side would say in this case that there is an obviousness problem because of the fact that you have metoprolol succinate in both claims. Is that correct? That is their position, as I understand it. Why is that not correct? And why are you not hurt on this issue by the fact that you could, after the expiration of the 318 patent, nevertheless go after someone who had a composition that had claim one of the 154 in it? Well, as Judge Rich explained in the general foods decision and in several other decisions that he wrote, double patenting is tested by comparing the invention claimed in the first patent with the invention claimed in the second patent. And it is improper simply to pick words out of the first patent claim as though it were a printed publication bar, which it is not. And so what the defendants are doing here is simply taking two words out of the prior claim, metoprolol succinate, and saying, okay, that's a disclosure of metoprolol succinate. The invention in the first patent was a formulation that was characterized by a number of layers of defined type. That was the basis of that invention. The nature of the active ingredient was pretty much independent. So the patentability, the invention claimed there, was a formulation with multiple layers in which the active ingredient could have been anything, and in one of the dependent claims, metoprolol succinate happened to be listed along with the others. Suppose you had a situation, and to make sure I understand this, say you had a patent out there in the form of the 318 patent, the way it was claimed 6, 7, and 8. And then someone comes along, a separate party comes along and tries to patent what's claim 1 in the 154 patent. Would they have an obviousness objection against them? Well, they would have a problem under 102E if there's a prior application that happens to dispense the compound. Say it was a prior patent. It would be a prior patent. That would be a different basis for invalidity, but it obviously would not be double patenting. The test for double patenting is did the applicant claim either the same invention or an obvious variant of that invention in a second patent? And here the first invention was a two-layer formulation where the active ingredient didn't matter. And you're saying that the claim 1 of the 154 is not, quote, an obvious variant, close quote, because it only is to one of the 11 compounds noted in claim 8. What I say is that it is a separate invention. 154 is the invention of the single compound metoprolol succinate. It is not, as the district court judge said, a genus that covers pharmaceutical formulations of metoprolol succinate. It is just a claim to metoprolol succinate. And even if the first patent had never mentioned metoprolol succinate, the second patent would stop anybody from making that formulation in which metoprolol succinate was the active ingredient. So that's simply the wrong test. You've got to compare what the two inventions were and whether one is separate from the other. Do you want to say any rebuttal? I would like to rebuttal. Thank you. Mr. Alper, are you the one? No, Your Honor. All right. Let's have the one-minute man first. Sorry, Your Honor. I intend to rely on the arguments of my colleagues, as we did in our brief. I just wanted to suggest to the court, when it confers on this matter, that it consider a summary affirmance under Rule 36. Okay. Thank you, Your Honor. May it please the court. I'm Charles Weiss, and I will be addressing primarily the double patenting issues, and my colleague, Mr. Maddox, will be addressing the inequitable conduct issues. Mr. Weiss, why is Mr. Brooktole's argument wrong that if, in fact, it is a composition versus a compound, why are the members of the composition, which are not patented, not be a double patenting for the compound? Well, I think we start, in response to Your Honor's question, with looking at the test of patentable distinctness that's been consistently articulated in the cases. The cases say that the latter claim is invalid for double patenting unless it is patentably distinct, and the cases consistently, this is Eli Lilly, Berg, Geneva, Emmert, all the cases that we cite in our briefs state that the later claim is not patentably distinct if it is anticipated by or rendered obvious by the earlier claim. Well, that's the basic test. Yes. Now, here the earlier claim does not just disclose metoprololsoxanine. Mr. Bechtol said in response to your question, Judge Shaw, that it's disclosed in there. Well, it's not just disclosed in there. What we have here is a specific claim directed to formulations of metoprololsoxanine. That's part of a composite, though, isn't it? It is a claim that is directed to numerous compositions that include metoprololsoxanate within them. So, for example, we would have a different question if we had just a disclosure, as if the earlier claim had a negative proviso. Claim 8 stated a two-layer thing where the active is this, this, this, but not including metoprololsoxanate, we would have a very interesting issue. If that was treated as a 102B prior art, it would clearly anticipate because naming the compound anticipates even if you teach away from it. But here we do not have that. We have the claim specifically directed to formulations that include metoprololsoxanate. And the court in In Re Brat, which was a two-way test case, but there's a statement in there that I think is illuminating. This is 937F2nd 589 at 594 note 5. The court notes, as we agree, that one must focus on what is claimed, not what is in the specification of the patent. And the court states that in order to do that, a good way to compare the claims is to start with what we're calling the reference claim. But that also says, is there a patentable difference between the two sets of claims, doesn't it? Well, it was a two-way test case, so one has to ask if the claims cross read on each other. But what it also says is- So they would have to be patentably distinct in order to avoid double patent. In each direction. Right. But what's useful in it, I think, and illuminating is its instruction about how to compare claims as compared to prior art per se. And it states that it's useful to compare what I'm calling the reference claim. I'm sorry. It says that it is useful to compare what we're calling the challenge claim with a tangible embodiment that's disclosed by and falls within the scope of the reference claim. Now that's exactly what we have here. Claim 8 of the 318 patent very expressly discloses and claims as a tangible embodiment a two-layer composition comprising the active metopremal succinate. So let me ask you, as I gather, I think Mr. Bechtol, he relies primarily on, he relies, it seems, on the General Foods case and these other older, older, older CCPA cases. And I'd like you to do two things, if you could. Number one, why does he not have, why is he not on pretty good ground on General Foods? And number two, what's wrong with those older cases? Because, you know, we've learned from the Supreme Court that sometimes these cases are old and they're lurking in the bushes, but then they can kind of jump out and bite you. If you could just address those two points. Yes, Your Honor. First of all, with respect to General Foods case, the General Foods case on its facts, as stated in the court's decision, is clearly a two-way test case. The court does not say we're applying the two-way test. It does not say we're applying the one-way test. But there are numerous indicia that I'll go through that show that that is a two-way test case. First of all, the cases that are primarily relied on, that are very strongly featured in that case, are In Re Brat and In Re Bora, which is 354 F. 2nd. 109. Well, let me, since you don't have that much time, and if we had an extended period, I'd let you go on. What if one disagrees with your reading of General Foods as relying on two-way cases? Yes, Your Honor. You would say, I guess, it still doesn't make a difference, right? It does not, Your Honor. Why is that? It's factually a two-way test case, no matter what's relied on it. The reason is that the court takes great pains to point out that the patent that is the reference patent that issued first claimed an improvement on the original invention that was made later and could not have been included in the original application. That is front and center, the feature of that claim. The subject matter could not have been included in the same application. And in In Re Brat, the court talks about when the one-way test applies and when the two-way test applies and also features that front and center in terms of when the two-way test applies and rejects application of the two-way test in Brat because the applicants did not make a second invention later and thus were not prohibited from planning them all at once. And I would just, in conclusion, like to note another case that we cite, which is In Re Schneller, which is 397 F. Second 350. And at 353 to 354, it states, this is not a case of an improvement or modification invented after filing. Hence, it is not the usual obviousness type double patenting case. That's also written by Gentrych. That shows, I think, what the thinking was about double patenting in cases like General Foods. I need to briefly define my meeting to show I should let Mr. Maddox speak. I'll rely on your brief for the answer to the second part of my question. Thank you. Fair enough. Please sit down. My name is Stephen Maddox here for appellees to address inequitable conduct. Let's start right away with the letter that was sent to, that Nazem sent to Filardi. The rule is clear. You can discharge your duty of candor by disclosing to an attorney. But the rule is equally clear that you need, that all disclosures pursuant to that section, mean you cough up copies of the document that you're talking about. In this case, he did not do that. There is no copy of the Swedish petition where he said not only that Nuremberg invented the compound, but more particularly said in that petition that Appelgren and Eskilsson really worked on a control release formulation. There's no copy of the agreement between Leyes and Eskilsson. There's no copy of letters with Leyes in February, twice, in May, twice. And in these letters he says at most Appelgren and Eskilsson invented a particular form of bilayer control release formulation. Mr. Weiss, can I ask you one question? Yes, ma'am. Again, because time is fleeting, normally I wouldn't jump in quite so quickly on you. But the inequitable conduct issue went off on summary judgment, right? Yes. And you prevailed on that. You obviously are – can we decide this issue on the basis of the summary judgment record? In other words, you would say we could say that inequitable conduct was shown on summary judgment, right? Yes. Could we, though, on the other hand, say – I mean, you would disagree with this, I know – but could we, in the summary judgment context, say that no, this record, as a matter of law, does not establish inequitable conduct? You certainly could. I don't think you should. Oh, no, I understand that, but you don't think there's any facts if one – in other words, I'm not articulating my question well. I guess what I'm trying to say is, are there any facts in your view that are out there that are not on the record that would prevent one from going the other way? No, I do not believe so. So we can rule either way on this record, it's your view? Yes. Okay. And in particular – so anyway, the letter, as I say, didn't have any of the documents. It didn't provide any of the information that Justice Schramm. It didn't say what Alpagrin and Eskoson did. It didn't say that for three years Naismith insisted that Alpagrin and Eskoson invented a particular formulation of a bilayer sustained release. And remember what we're talking about here, the 154 patent application, which claimed only the compound, did not claim any sort of formulation at all, just the compound. The other issue I would like to take up is their argument that, look, we could have fixed this. We could have gone back – if we did need to change inventorship, we could have gone back to the 318 priority application in the U.S. and therefore there could be no intent. And what it really comes down to is a materiality argument. They're saying that if it was disclosed and if the examiner wanted to get into it and said they were wrong, that they could go back and fix the 318 inventorship and still keep their priority. Now, let me ask you the same question I asked Mr. Burke about the applicability of priorities of vice on a 154 patent. Was that limited to 161 or 154 or both? Both. It was covering both. Well, 154 did not exist then. But it was covering inventorship of metropolis subsidy. But it's not – 161 was the one that he was being asked questions about, not 154. Yes, sir. And it had the claim to metropolis subsidy and a particular formulation. So he couldn't have given advice on 154. No, the document does not refer to the 154 application on its face. So it's restricted to 161. Yeah, on its face it talks about the pending application, which has the metropolis subsidy claim and the metropolis subsidy formulation claim. Now, that doesn't mean that ASTRA didn't – they filed and held out Appleburn and Eskerson as the inventor on the 154 application with just the metropolis subsidy claim. And they didn't disclose to Fullerton, and certainly no one ever told the patent office that ASTRA for years had insisted not only that Appleburn and Eskerson hadn't invented metropolis subsidy, but that what they really had done was a particular formulation, a particular sustained release bilayer formulation. To turn for a moment to their motivation argument that we could have fixed it all, a couple things. First of all, it's a materiality argument, saying it would have been fine if the patent would have been issued because the intervening argument would have been avoided. That's not a defense to materiality, the fact that it might – you can see the circumstances under which it might have issued. Secondly, it's circular, because under the rule of Rule 48, they would have had to provide affidavit proof, or sworn statement proof, that they did not have any deceptive intent, that this was all an up-and-up innocent mistake. Basically, you're saying, as a defense to saying we – they say we had no intent to deceive the patent office because we could have had the opportunity to submit affidavits to show that we had no intent. That's one big circle. Finally, in this case, and this goes to Charles' question, you have the facts before you've been in the record already. There are a couple of undisputed facts which show that they couldn't have changed anything. First of all – What if the district court weighed evidence in deciding the summary judgment function, weighing different points of evidence that should be weighed by a jury instead of the judge at that point? If the court weighed evidence that should have been weighed by the jury, then the summary judgment is not the court. So we should send it back at that – if we find that the judge did weigh evidence. If you find that he violated the standard of no reasonable juror could find an S, then you should. But there were two undisputed facts in the record with respect to their ability to correct this. First of all, Naismith already knew, and Pellenson insists, that Appelgren and Eskelson refused to sign an affidavit saying that they invented this with Lindenburg, much less Lindenburg invented it instead of them or anyone else instead of them. They couldn't get the declaration required by Rule 48. Secondly, they couldn't be joint inventors with Lindenburg because there was no quantum of collaboration over the line of communication. Thank you. I apologize. I think I misidentified you. I got a little bit confused with the three-ring circus here. My apologies also to counsel. I addressed you incorrectly. My apologies. May I please report just very briefly on inequitable conduct? The question is the substance of what was disclosed to Florey, not the form. And whether he gave them copies of four letters that said we said Lindenburg was the sole inventor or he says we said Lindenburg was the sole inventor, it's the same in substance. I did want to get to the question of motivation because what the district court found was that the motivation for Nesman withholding the information is the fear that if Lindenburg is made the sole inventor, they'll lose priority. Well, Mr. Nesman repeatedly made the statement that they believed Mr. Lindenburg was the sole inventor. If he was fearful, that was going to produce a bad result. That's a very strange way to behave. But in fact, the motivation you can't find in any document, in any testimony, nobody ever said we feared that we could lose priority. And the court based that on a legal theory that if they had changed to Lindenburg as the sole inventor, they would have lost priority. As we pointed out in our brief, two cases from this court for the CCPA, Weil v. Fritz and the Schmidt case, both say that if they had made Lindenburg the sole inventor of that pending CIP application, the effect would have been to add him as an inventor in the parent application. There would have been no loss of priority. So not only was it a motivation that nobody had, but on the legal basis, it's a motivation that nobody could have had. Let me – one question, Mr. Vettel, in response to – what is your response to what Mr. Weiss said about the General Foods case upon which you – I asked him about that and went through that at some length, explaining why that doesn't help you. What is your response to his contentions on that? General Foods has been repeatedly cited as basis for a one-way test. I don't think that makes a great deal of difference. But what General Foods said very clearly is in that case, the prior patent was a claim to a number of steps, A through J, and the second patent was to step A. There is no doubt that step A was disclosed in the prior patent, and if it had been a prior publication, it would have been a 102 bar. But Judge Rich explained you can't just take words out of the prior claim and treat it as though it's a publication. You have to look at the invention. So General Foods clearly supports us. It clearly is contrary to what the defendants are trying to do here. Do you think it applies a two-way test? I don't think General Foods applies a two-way test, no. As a matter of fact, in General Foods, the delay was due – the delay in issuance was due to the applicant, and that's the antithesis of the two-way test. It could not have been a two-way test case. Just one other thing on this question, Appelgren and Eskilsson being the inventors. The only issue that anybody ever raised contemporaneously was, was the inventor Nittenberg or Appelgren and Eskilsson? The only reason they ever questioned whether Appelgren or Eskilsson were the inventors of the compound is because they said Nittenberg did it first. And when they went to the Swedish patent office, the Astra people went back and looked at their records and said, well, how can we challenge this latest patent? And all they came up with was Nittenberg did it before Appelgren and Eskilsson did. That was the only issue. And when Filarity was presented with the evidence, it was, this man made a compound 10 years ago, did nothing with it. It was done in Sweden. It's not a 102F situation. It's not a 102G situation. This was a slam dunk that Nittenberg couldn't possibly have been made an inventor. So there was no materiality here and certainly no motive. Are you saying no materiality even under the facts as they're laid out in the summary judgment setting? That's correct. You're saying we could take these facts and say no materiality? Yes, Your Honor, because if they had told the patent examiner every one of those facts, it would have made absolutely no difference. It was not material to the prosecution. Nittenberg could not possibly be an inventor. And even today when they're trying to knock out this patent, they don't say Nittenberg was the inventor. If they thought he was, they'd make that argument and say the patent was bad for bad inventorship. They don't say that. Thank you, Your Honor. Thank you. Case is submitted.